# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-CC-01150-COA

**BRINDA PATTERSON**                                                          **APPELLANT**

**v.**

**MISSISSIPPI DEPARTMENT OF**                                      **APPELLEES**
**EMPLOYMENT SECURITY AND THE GOLDEN**
**MANUFACTURING COMPANY**

DATE OF JUDGMENT:          09/09/2021
TRIAL JUDGE:          HON. JOHN R. WHITE
COURT FROM WHICH APPEALED:   PRENTISS COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:   BRINDA PATTERSON (PRO SE)
ATTORNEY FOR APPELLEE:   ALBERT B. WHITE
NATURE OF THE CASE:   CIVIL - STATE BOARDS AND AGENCIES
DISPOSITION:   AFFIRMED - 10/04/2022
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE BARNES, C.J., GREENLEE AND LAWRENCE, JJ.**

**LAWRENCE, J., FOR THE COURT:**

¶1. Brinda Patterson appeals pro se from the Prentiss County Circuit Court's judgment affirming the decision of the Mississippi Department of Employment Security's Board of Review (Board) to deny her unemployment benefits. After review, we find that the Board's decision was supported by substantial evidence and was not arbitrary or capricious. Accordingly, we affirm.

## FACTS

¶2. Patterson began working as a seamstress at the Golden Manufacturing Company (Company) on January 3, 2012. On March 20, 2020, the Company shut down for two weeks

due to COVID-19. When the Company re-opened on April 6, 2020, Patterson did not return because she feared contracting COVID-19, especially because she suffered from obesity and high blood pressure. On May 15, 2020 the Company terminated Patterson's employment for exceeding her 140 allowed hours of absence from work. Specifically, the Company determined that Patterson had abandoned her job by not returning to work on April 6, 2020, when the Company re-opened after the two-week shutdown.

¶3.     Patterson subsequently filed for unemployment benefits with the Mississippi Department of Employment Security (MDES). Patterson claimed that she had not returned to work because the Company was not following required safety protocols, such as maintaining six feet between employees and requiring masks. Following an investigation, an MDES adjudicator determined that the Company failed to meet its burden of proof to show that Patterson's employment was terminated due to misconduct, as required by Mississippi Code Annotated section 71-5-513(A)(1)(b) (Supp. 2019). The investigator based his determination in part on Patterson's decision not to return to work based on her health conditions that made her susceptible to COVID-19 complications if she contracted the illness. The Company appealed the MDES' decision to the Administrative Law Judge (ALJ).

¶4.     On February 11, 2021, the ALJ conducted a telephonic hearing. Patterson and Charles Carr, the vice president of the Company, testified. Carr testified that Patterson last appeared at work on March 20, 2020. When asked why her employment was terminated, Carr explained that Patterson had exceeded her allowable absentee hours when she did not return to work after the Company's two-week shut down due to COVID-19. Carr further testified

2

that to his knowledge, Patterson never submitted a doctor's excuse explaining why she did not return to work.

¶5.     Patterson testified that she never received documentation about her hours. She claimed she called every three days to inform the Company she was not coming to work. Patterson also stated that she stopped going to work because the Company "could not provide [her] a safe environment." She testified that she suffered from obesity and high blood pressure. The ALJ asked Patterson, "So did you[r] doctor advise you not to go back to work during the pandemic?" Patterson responded, "Yes . . . .I turned the paper in. Yes. It's not safe down there." At that point, the ALJ entered into the record Patterson's medical document entitled "Mississippi Department of Employment Security Doctor's Certificate." The document was completed by Patterson's physician, Dr. Jennifer Pierce, on June 2, 2020. According to the form, Dr. Pierce treated Patterson for hypertension and obesity from December 14, 2018, to March 9, 2020. Dr. Pierce was specifically asked if she had advised Patterson to leave work. She marked, "No." Dr. Pierce was also asked if she had released Patterson to return to work. She marked, "Yes." When the ALJ asked Patterson about Dr. Pierce's release of Patterson to return to work, Patterson responded, "I mean . . . it's an unsafe environment. They could not give me six feet. They don't [do a] mandatory mask. I mean . . . it's not safe to go down there. They have cases . . . I don't want to get COVID[-19]."

¶6.     After the hearing, the ALJ issued a decision reversing Patterson's award of unemployment benefits. In doing so, the ALJ determined that Patterson was disqualified

3

from receiving benefits in accordance with Mississippi Code Annotated section 71-5-513(A)(1)(a) because she voluntarily left work without good cause as opposed to being terminated for misconduct. The ALJ reasoned that although Patterson claimed her doctor had advised her not to return to work based on her health conditions, the medical document she provided stated the contrary. Patterson appealed to the Board, which adopted and affirmed the ALJ's findings of fact and the decision with one amendment: the Board noted that Patterson may be eligible for Pandemic Unemployment Assistance but did not qualify for unemployment benefits. Patterson then appealed to the circuit court, which found that the Board's decision was supported by substantial evidence and was not arbitrary or contrary to law. Patterson now appeals from the circuit's order Finding no error, we affirm.

## STANDARD OF REVIEW

¶7.     "[T]he findings of the Board of Review as to the facts, if supported by evidence and in the absence of fraud, shall be conclusive, and the jurisdiction of the court shall be confined to questions of law." Miss. Code Ann. § 71-5-531 (Rev. 2021). Thus, this Court "must not reweigh the facts of the case or insert its judgment for that of the agency." *Allen v. Miss. Emp. Sec. Comm'n*, 639 So. 2d 904, 906 (Miss. 1994).

¶8.     "An agency's conclusions must remain undisturbed unless the agency's order: (1) is not supported by substantial evidence, (2) is arbitrary or capricious, (3) is beyond the scope or power granted to the agency, or (4) violates a statutory or constitutional right of the complaining party." *Miss. Dep't of Emp. Sec. v. Good Samaritan Pers. Servs.*, 996 So. 2d 809, 812 (¶6) (Miss. Ct. App. 2008). "[A] rebuttable presumption exists in favor of the

4

administrative agency[,]" and Patterson "has the burden of proving otherwise." *Jackson Cnty. Bd. of Sup'rs v. Miss. Emp. Sec. Comm'n*, 129 So. 3d 178, 183 (¶13) (Miss. 2013) (quoting *Miss. Emp. Sec. Comm'n v. Harris*, 672 So. 2d 739, 743 (Miss. 1996)).

## ANALYSIS

¶9.    Patterson's sole argument on appeal is that the Board erred in finding that she was not entitled to unemployment benefits when she chose not to return to work because of COVID-19. In her own words, she stated that "COVID-19 is responsible for more than 700,000 deaths in the [United States], and [the Company] was aware of my circumstances and would not promise me [a] six-feet guarantee or [a] guarantee [that] my co-workers around me would wear [a] mask." Section 71-5-513(A), provides guidelines for when an employee shall be disqualified from unemployment benefits:

> (1)(a) For the week, or fraction thereof, which immediately follows the day **on which he left work voluntarily without good cause**, if so found by the department, and for each week thereafter until he has earned remuneration for personal services performed for an employer, as in this chapter defined, equal to not less than eight (8) times his weekly benefit amount, as determined in each case; however, marital, filial and domestic circumstances and obligations shall not be deemed good cause within the meaning of this subsection. Pregnancy shall not be deemed to be a marital, filial or domestic circumstance for the purpose of this subsection.

> (b) For the week, or fraction thereof, which immediately follows the day **on which he was discharged for misconduct** connected with his work, if so found by the department, and for each week thereafter until he has earned remuneration for personal services performed for an employer, as in this chapter defined, equal to not less than eight (8) times his weekly benefit amount, as determined in each case.

> (c) **The burden of proof of good cause for leaving work shall be on the claimant, and the burden of proof of misconduct shall be on the employer.**

5

(Emphasis added). Here, the Board adopted the ALJ's findings of fact and affirmed the ALJ's holding that Patterson failed to meet her burden of proof to show good cause for leaving her employment. That decision is supported by substantial evidence in the record. The record shows that Patterson did not return to work when the Company re-opened on April 6, 2020. Although she claimed her doctor had advised her against returning to work, her medical form presented during the ALJ's telephonic hearing did not support that claim. Patterson acknowledged that she was aware of the policy providing for termination after 140 hours of absences. After Patterson exceeded those hours, she chose not to return to work.[1] Dr. Pierce indicated that Patterson was able to work and that Dr. Pierce had **not** advised Patterson to leave work. For the reasons discussed above, we find the Board's decision is supported by substantial evidence and is not arbitrary or capricious. We therefore affirm the Circuit Court's order affirming the Board's decision to deny Patterson unemployment benefits.

¶10. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, SMITH AND EMFINGER, JJ., CONCUR. WESTBROOKS, J., CONCURS IN RESULT ONLY WITH SEPARATE WRITTEN OPINION, JOINED BY McDONALD, J. McCARTY, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED IN PART BY McDONALD, J.**

**WESTBROOKS, J., CONCURRING IN RESULT ONLY:**

---

[1] The dissent argues that Patterson's refusal to return to work on conditions she sought to impose on her employer was not "misconduct." However, the ALJ, the Board, and the circuit court all found Patterson failed to meet her burden of proof to show good cause for leaving her employment. There is substantial evidence in the record to support that conclusion, and given our limited standard of review, this Court is duty bound to affirm.

¶11. I agree with the majority's decision to affirm the circuit court's order affirming the Mississippi Department of Employment Services (MDES) Board of Review's judgment denying unemployment benefits to Brinda Patterson. However, I write separately to emphasize the absent language in our Mississippi unemployment-ineligibility statute in the midst of COVID-19 and how it should rise to meet the present circumstances.

¶12. Patterson was employed as a seamstress with Golden Manufacturing between January 3, 2012, and May 15, 2020. Golden Manufacturing closed its office for two weeks due to COVID-19, prior to Patterson's end date (March 20, 2020–April 6, 2020). On March 26, 2020, Patterson filed for unemployment benefits. Subsequently, Patterson did not return to Golden Manufacturing on April 6, 2020, or any time thereafter. Patterson called Golden Manufacturing every three days to report that she was not coming in due to COVID-19, as her high blood pressure and obesity put her at increased risk. On July 29, 2020, the MDES adjudicator granted Patterson unemployment compensation. Golden Manufacturing appealed, and a hearing was held on February 11, 2021, after which the Administrative Law Judge (ALJ) reversed the adjudicator's decision. The ALJ concluded that Patterson did not have good cause for leaving work, reasoning that "[a]n individual can contract a virus anywhere, not just at work." The Board of Review affirmed. The circuit court affirmed.

¶13. Whether Patterson left work voluntarily and had good cause for doing so are both questions of fact for the administrative agency. Miss. Code Ann. § 71-5-513(A)(1) (Supp. 2019); *Dailey v. Miss. Dep't of Empl. Sec.*, 271 So. 3d 715, 719 (¶18) (Miss. Ct. App. 2018). Nevertheless, in my opinion, COVID-19 has presented unforeseen circumstances that warrant

7

a review of our unemployment ineligibility sections, because the statute is silent as to how a global crisis—like COVID-19—interacts with the "good cause" provision in section 71-5-513(A)(1).

¶14.  Under the statute, the good-cause subsections state:

A. An individual shall be disqualified for benefits:

(1)(a) For the week, or fraction thereof, which immediately follows the day on which he left work voluntarily without good cause, if so found by the department, and for each week thereafter until he has earned remuneration for personal services performed for an employer, as in this chapter defined, equal to not less than eight (8) times his weekly benefit amount, as determined in each case; however, marital, filial and domestic circumstances and obligations shall not be deemed good cause within the meaning of this subsection. Pregnancy shall not be deemed to be a marital, filial or domestic circumstance for the purpose of this subsection.

. . . .

(c) The burden of proof of good cause for leaving work shall be on the claimant, and the burden of proof of misconduct shall be on the employer.

. . . .

(3) If the department finds that he has failed, without good cause, either to apply for available suitable work when so directed by the employment office or the department, to accept suitable work when offered him, or to return to his customary self-employment (if any) when so directed by the department, such disqualification shall continue for the week in which such failure occurred and for not more than the twelve (12) weeks which immediately follow such week, as determined by the department according to the circumstances in each case.

(a) In determining whether or not any work is suitable for an individual, the department shall consider among other factors the *degree of risk involved to his health, safety* and morals, his physical fitness and prior training, his experience and prior earnings, his length of unemployment and prospects for securing local work in his customary occupation, and the distance of the available work from his residence; however, offered employment paying the minimum wage or higher, if such minimum or higher wage is that prevailing

8

for his customary occupation or similar work in the locality, shall be deemed to be suitable employment after benefits have been paid to the individual for a period of eight (8) weeks.

Miss. Code Ann. § 71-5-513(A)(1)-(3)(a).  Section 71-5-513(A)(1)(c) is the provision on which the ALJ and the Board of Review based its finding that Patterson did not qualify to receive unemployment benefits.  Patterson argued that she legitimately left Golden Manufacturing during COVID-19 (which is ongoing), due to the health risk presented by the national pandemic and Golden Manufacturing's refusal to mandate safety protocols, such as wearing masks and standing six feet apart.  However, the ALJ concluded as a finding of fact that Patterson did not prove that she left Golden Manufacturing with good cause.  But section 71-5-513(A)(3)(a) states that the Mississippi Department of Employment Services may not consider work suitable or force an unemployment individual to accept new employment if there is a "degree of risk involved to his health, safety and morals . . . ."  Miss. Code Ann. § 71-5-513(A)(3)(a).  These provisions make clear that while MDES will consider a risk to health and safety "good cause" for not accepting a *new* employment offer under section 71-5-513(A)(3), such consideration is absent from the "good cause" provision of section 71-5-513(A)(1) regarding a person who left her *prior* employment.  Herein lies the issue.

¶15.    It is undisputed that COVID-19 brought forth a global crisis and, more specifically, charged Mississippians into a state of emergency.  With over one million deaths,[2] and to this day no foreseeable cure, it is understood that COVID-19 presented an unprecedented

---

[2] United States Department of Health and Human Services, Centers for Disease Control and Prevention, COVID Data Tracker, https://covid.cdc.gov/covid-data-tracker/#datatracker-home (last visited Oct. 3, 2022).

circumstance. The COVID-19 crisis was an immediate and unforeseeable threat to life. Yet our Mississippi unemployment-benefits law provides no such exception for national emergencies. Section 71-5-513(A)(1)(a) implicitly includes pregnancy as a "good cause" for leaving work, and Section 71-5-543[3] provides an exception for natural disasters.[4] Miss. Code Ann. § 71-5-543 (Rev. 2021).

¶16. This absence left Patterson with no recourse when Golden Manufacturing failed to provide its employees with any assurances of their safety. Patterson argues that "[t]he Company I worked for couldn't give me a safe work place" because Golden Manufacturing did not obligate its employees to wear masks or to always stand six feet apart.[5] It was produced at the hearing that Patterson called every three days to report that she could not return due to her high susceptibility of receiving COVID-19 because of her high blood pressure and obesity.

---

[3] Mississippi Code Annotated section 71-5-543(1) provides in relevant part:

(1) Except as otherwise provided in this section, the executive director of the department may waive recovery of benefits paid under this chapter to a person if the person is subsequently found to be ineligible for the benefit and the benefits were paid as a direct result of unemployment caused by a natural disaster which is declared by the President of the United States in accordance with Section 401 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act . . . .

[4] The President of the United States declared that COVID-19 was a national emergency—not a national disaster, which would have invoked section 71-5-543.

[5] Although Gold Manufacturing's representative said during the unemployment hearing that "[w]e have separated everybody out," Patterson argues that "people were not six feet apart," and since she worked as a seamstress, "almost one hundred people would touch the fabric before it would get to me and it would have never been disinfected."

10

¶17.    Accordingly, I emphasize, that due to COVID-19's unforeseen circumstances, it was Golden Manufacturing's failure to provide safe conditions for all of its employees that caused Patterson to leave her employment. While I cannot say that the Board of Review erred by finding that Patterson did not have good cause as the statute currently reads, I can say that COVID-19 should have been treated as a hazardous condition and that the result of this case exemplifies that our Mississippi-unemployment benefits law is lacking. It is left up to our Mississippi Legislature to amend section 71-5-513(A) and include an exception for national and state emergencies. Without such an exception, I must uphold the law as it is. Therefore, with great reluctance, I concur.

**McDONALD, J., JOINS THIS OPINION.**

**McCARTY, J., DISSENTING:**

¶18.    I have 2 underlying health conditions which puts me in the high risk category. I take medicine for high blood pressure . . . . I was placed under a shelter at home order by the governor of the state and state health office Thomas Dobbs because of being in the high risk category. . . . The state health office was on the TV everyday begging me to stay home. What would you have done?

*Letter from Brinda Patterson filed with the Prentiss County Circuit Court*

¶19.    Last year the Mississippi Supreme Court re-affirmed "that the underlying purpose of Mississippi's employment security law is to protect those workers not permitted to continue employment *through no fault of their own*." *City of Grenada v. Miss. Dep't of Emp. Sec.*, 320 So. 3d 523, 526 (¶16) (Miss. 2021) (emphasis added) (internal quotation marks omitted). The testimony and record in this case show that the claimant didn't refuse to return to work in Spring 2020 because she hated her job, was sick of her boss, or was lazy.

11

¶20. Instead, through no fault of her own, but because of an unprecedented global health crisis, Ms. Patterson had a good faith belief that her workplace was "an unsafe environment." She later told the ALJ she was specifically concerned about the lack of distancing between workers and that there was no mask requirement. "I don't want to get Covid," she told him.

¶21. And of course that is what this case is *really* about—not a note from a doctor. The majority rests its entire decision on whether Ms. Patterson's doctor forbade her from going to work, but this ignores the uncontested reality of April 2020 and our standard for misconduct. That time in 2020 was the very genesis of the spreading pandemic, one which has now been attributed to causing the deaths of 1,054,195 Americans[6] and 12,912 Mississippians.[7]

¶22. In its determination at the first stage of proceedings, MDES found that the Company did not show "the claimant was discharged for misconduct connected to the work" and that "[t]he claimant is eligible for Unemployment Insurance benefits based on this separation." Upon review, the administrative adjudicator cited Ms. Patterson's lack of good cause in overturning the MDES decision and therefore finding Ms. Patterson had committed misconduct.

¶23. It is well established that under state law "a person who voluntarily leaves work qualifies to receive unemployment benefits only if he can show that he had 'good cause' to

_____

[6] United States Department of Health and Human Services Centers for Disease Control and Prevention, COVID Data Tracker, https://covid.cdc.gov/covid-data-tracker/#datatracker-home (last visited Oct. 3, 2022).

[7] Mississippi State Department of Health, Coronavirus Disease 2019 (COVID-19) https://msdh.ms.gov/msdhsite/_static/14,0,420.html (last visited Oct. 3, 2022).

terminate his employment." *Hereford v. MDES*, 306 So. 3d 863, 866 (¶15) (Miss. Ct. App. 2020). "MDES Unemployment Insurance Regulation 309.00 states that in order to prove this fact, a person must demonstrate that an 'ordinary, prudent employee' in his predicament would feel compelled to terminate his employment." *Id*. "He must also show that prior to leaving his job, he 'explored' alternatives to quitting' and 'made' reasonable efforts to preserve employment.'" *Id*.

¶24. In *Hereford*, we found that a security guard who was confined to a wheelchair did not act as a prudent person when he "quit *before finding out* whether his employer would accommodate his need for a wheelchair." *Id*. at (¶18) (emphasis added). Since "his medical provider 'left it up to [him]' to determine whether to continue working" after his physician told him "he would need an electric-powered wheelchair." *Id*. at 864, 866 (¶¶3,8).

¶25. In affirming that the claimant was not entitled to benefits, we also determined he "failed to first explore reasonable avenues to remain employed before leaving his job, as precedent requires." *Id*. at 866 (¶19).

¶26. In many ways Ms. Patterson's case is the *opposite* of what happened in *Hereford*. Unlike the security guard there, who quite simply did not seem like he wanted to do the job anymore, she *wanted* her job as a seamstress. This was not just a fill-in spot she had worked for a few weeks before getting sick of it. She worked from January 2012 until March 20, 2020—just over eight years.

¶27. And as the record continually reveals, she wanted to go back to work, calling every three days from April 6 through May 14 in part to inquire about the safety precautions that

were being taken. Ms. Patterson sought affirmation that her workplace was using distancing and masks because she had been diagnosed with both hypertension and obesity. When told the workplace was not, she declined to return to work.

¶28. Against the backdrop of an unprecedented pandemic that has killed over a million of our fellow citizens, whether someone had a doctor's note is unimportant. The reality of 2020 and the record before us conclusively show that Ms. Patterson did not commit misconduct. Under the unique facts of her health diagnoses and her workplace, she acted as an "ordinary, prudent person" should have acted in accordance with the advice given by our federal and state governments and their respective health departments.

¶29. Ms. Patterson's response to crisis was caution. That is not misconduct, and so I believe she should receive her unemployment benefits.

**McDONALD, J., JOINS THIS OPINION IN PART.**

14